**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **VOLT POWER, LLC, a Delaware** ) | |
| **limited liability company,** ) | |
| ) | |
|     **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **JAMES ERIC DEVILLE,** ) | **Case No. 1:21-CV-00395** |
| ) | |
|     **Defendant.** ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

**VOLT POWER, LLC'S VERIFIED COMPLAINT**
**AND REQUEST FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

Plaintiff, Volt Power, LLC ("Volt Power" or the "Company"), for its Verified Complaint

and Request for Preliminary and Permanent Injunctive Relief (the "Verified Complaint") against

Defendant, James Eric Deville ("Deville"), alleges as follows:[1]

**Parties**

1.      Volt Power is a limited liability company organized and existing under the laws

of Delaware, with its headquarters in Atlanta, Georgia.

2.      Volt Power is also licensed to do business in the State of Louisiana and has

offices in Boyce, Louisiana.

3.      Deville is an individual of the full age of majority, who, on information and

belief, is a domiciliary of Louisiana, and who worked for Volt Power in Boyce, Rapides Parish,

---

[1]      In the interest of privacy, Volt Power does not identify certain clients referred to herein, and refers to them simply as clients of Volt Power.  Volt Power will identify those clients not specifically identified in this Complaint, if necessary, at the time and in the manner required by applicable law and the Court.

Louisiana.  Deville is a former employee of Volt Power, where he held the position of Manager, Joint Use Division.

## Jurisdiction and Venue

4.      This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367, as it presents claims arising under federal law, and specifically the Defend Trade Secrets Act, 18 U.S.C. § 1836 (the "DTSA"), as well as related state-law claims that arise from the same transactions and occurrences as the claims arising under federal law. This Court has supplemental jurisdiction over such state-law claims.

5.      This Court has personal jurisdiction over Deville because he is a domiciliary of Louisiana, and, at all times relevant to this Complaint, has worked in Rapides Parish, Louisiana. Furthermore, the misappropriation of trade secrets, as well as other breaches of contracts and violations of laws by Deville as alleged herein, primarily occurred in Louisiana and within the geographic district of this Court.  Thus, venue is proper in this forum for Volt Power's claims against Deville pursuant to 28 U.S.C. § 1391(b).

## Introduction

6.      Volt Power brings this lawsuit against Deville, a former employee who served as Manager of Volt Power's Joint Use Division.  During his employment, Volt Power believed that Deville was a loyal management-level employee working to advance the Company's interests. The Company's belief in Deville was so strong that the Company even offered to pay Deville's legal fees when he was sued by a former employer, in return for Deville's agreement not to solicit Volt Power's clients or to compete with the Company for a year after the termination of his employment.  Unfortunately, it turns out that, while portraying himself as a loyal Volt Power employee, Deville was instead engaged in a variety of surreptitious conduct directly harmful to

2

Volt but specifically beneficial to himself.  Volt first learned of some of this conduct only after Deville suddenly resigned his employment on January 4, 2021.  The scope and details of Deville's harmful conduct are still being revealed on an almost daily basis.

7.      Volt Power has recently learned that, prior to his abrupt resignation, and in violation of his promise not to compete with the Company,  Deville had already accepted a position with a direct competitor, Shelton Energy Solutions, LLC ("Shelton Energy").   In addition to accepting employment with a direct competitor, Deville also decided that he would take advantage of his then position with Volt Power to wrongfully convert Company proprietary information for the benefit of himself and his new employer.

8.      While still employed with Volt Power, Deville also began soliciting Joint Use Division employees to leave Volt Power's employ and to become employed with Shelton Energy.  Those solicitations largely proved successful, as several Volt Power employees have recently left the Company and are now employed by Shelton Energy.

9.      In addition to solicitation of his coworkers, Volt Power has discovered that, prior to his resignation of employment, Deville used at least two portable storage drives to access and misappropriate several files on his work computer that contained proprietary and confidential business information of Volt Power.

10.      Moreover, Volt Power has most recently learned that, beginning in November 2019, and continuing until his resignation, Deville concocted and engaged in a fraudulent scheme whereby he assigned a group of Joint Use Division Field Technicians to provide services to a client that the client did not request. The purpose of this unauthorized assignment was to cause the Field Technicians to book revenue on Volt Power's books that would then be used to falsely increase Deville's 2020 bonus.  Deville further used his position as Manager of the Joint

3

Use Division to hide this fraudulent billing scheme.  Although Deville was aware that the time booked by the Field Technicians would not be billable to the client (since it was not authorized by the client), Deville gladly accepted the fruits of his fraudulent scheme: thousands of dollars in a falsely-increased 2020 revenue bonus.  As a result, Volt Power has lost not only the bonus money that Deville fraudulently extracted from the Company, but the Company is now also unable to bill or collect the hundreds of thousands of dollars in revenue that was placed on Volt Power's books as a consequence of Deville's scheme.

11.    Volt Power has also recently discovered that Deville has been in recent communication with at least one Volt Power client regarding the services that Volt provided to that client.  Given Deville's other wrongful behavior discovered to date, Volt Power believes that the purpose of this contact is to solicit that client to become a client of Shelton Energy, in violation of Deville's agreement not to solicit Volt Power's clients.

12.    The purpose of this lawsuit is to obtain the intervention of this Court to enjoin Deville's ongoing wrongful violations of his restrictive covenants, his theft and use of confidential Company information, and any and all other illegal conduct, the consequences of which have caused and continue to cause irreparable harm to Volt Power's operations and interests.   Volt Power also respectfully seeks relief from the Court to remediate the damages to its business as a result of Deville's wrongful solicitation of Volt Power employees, his fraudulent scheme to falsely-increase his 2020 bonus payment, and any and all other calculable damages wrought by Deville's improper and self-interested actions.

### Volt Power's Business

13.    Volt Power is a power delivery service provider company, one of many companies in that highly-competitive industry.  Volt Power's mission is to be the power delivery

industry's leading service provider and employer of choice. Volt Power provides cutting edge services to the power industry by maintaining an uncompromising focus on its core values: People, Safety, Integrity, Accountability, Transparency, Continuous Improvement, and Excellence.

14.     Volt Power maintains its headquarters in Atlanta, Georgia, but also has field operations and offices in numerous states throughout the Southeast and Midwest United States. Volt Power's field office at issue for purposes of this Complaint is located in Boyce, Louisiana, but the areas impacted by Deville's improper conduct are much broader.

15.     Volt Power provides various services to power provider clients including, safety audits, post-storm equipment assessments, and assistance with government permitting.  Among the services Volt Power provides to its clients are pole "attachment counts."  In an attachment count, Volt Power Field Technicians survey power poles owned by a client power delivery provider to determine, among other things, the number of fiber/cable/telephone delivery components attached to the provider's poles by the respective fiber/cable/telephone service providers.  Those service providers remit "pole rent" for their attachments to the power provider's poles.    Thus, Volt Power's attachment counts assist its clients in determining/confirming the number of attachments to their power poles by other fiber/cable/telephone service providers and in calculating the amount of pole rent due to the power providers.

16.     Volt Power books its revenue as it records its progress on client projects.  Volt Power usually bills its clients based upon the hours worked by its employees on a project, the number of the "items" analyzed by the employees (such as the number of poles reviewed for attachment count purposes) while working on a project, or an amalgam of the hourly/item billing

4815-8157-9227v1
2934037-000006 02/11/2021

rates.  The amount Volt Power charges its clients is based on a so-called "crew rate," which is an hourly cost rate assigned to each Volt Power employee who works on a particular project.  Volt Power's profit on projects is calculated, to a material extent, by the difference between its internal crew rate cost and the amounts that it bills its client on a particular project.

17.     Volt Power typically secures work from its power provider clients by responding to their requests for project bid proposals.  Those bid proposals contain important information such as proposed services to be provided, the anticipated cost to the client – based in substantial part on the crew rates discussed above – and the anticipated timeline for project completion.  To secure the work on a particular project, Volt Power usually enters into a service contract with its client, based in large part on the terms of the previously-submitted bid proposal.  While many of Volt Power's bid proposals and contracts are focused on a particular project, other proposals and contracts are more wide-ranging, and involve Volt Power providing a variety of services to a given power provider client in connection with various aspects of the client's operations.

18.     Volt Power's success in the highly competitive, power delivery service industry is based in large part on its ability to service and develop relationships with its power provider clients.  To meet its clients' service expectations and needs, Volt Power has developed and maintained, at great expense, valuable working relationships and substantial goodwill with its clients and its crew members, both of which are of paramount significance to its business reputation and success.

19.     Due to the competitive nature of Volt Power's business, the Company undertakes all reasonable efforts to shield its trade secrets and other confidential and proprietary business information from its competitors, *e.g*., pricing structures, including crew rates, sales techniques, strategic plans, bid proposals, contracts, budget proposals, business records, client lists, current

4815-8157-9227v1
2934037-000006 02/11/2021

and proposed services, project agreements, *etc*…. This confidential and proprietary business information has independent economic value, both actual and potential, because it is not generally known or readily ascertainable to the public or competitors -- Volt Power considers all of this information a valuable trade secret. Indeed, Volt Power's trade secrets and other confidential and proprietary business information afford Volt Power a competitive advantage over its competitors.

20.    The bulk of Volt Power's trade secrets and other confidential and proprietary information are known only to select Volt Power employees who must access that information in order to service Volt Power's clients. All Volt Power employees are informed of the sensitive nature of this information and are explicitly directed not to disclose this information to third parties. *See* Exhibit 1, pg. 13, Volt Power Code of Business Conduct and Deville Acknowledgements of same. Volt Power further protects the secrecy and confidentiality of its trade secrets and other confidential and proprietary information by: (a) disclosing that information only to select employees and employees of power provider clients in confidential bid proposals and other related project communications; (b) maintaining trade secrets and other confidential and proprietary business information on password protected computer systems; and (c) restricting access to certain proprietary information, such as revenue and management reports, to high-level employees who have a need to access that information in order to perform their job duties.

21.    Volt Power derives economic value from the secrecy of its trade secrets and other confidential and proprietary information. If disclosed to or used by a competitor, the competitor would be able to unfairly compete against Volt Power in the power delivery service business. For instance, the disclosure of Volt Power's client list, bid proposals, and pricing structures,

7

including crew rates, would enable a competitor to underbid Volt Power when submitting competing bids to a potential or current power provider client and would also enable a competitor to use to its advantage Volt Power's client-specific project and operations information without having to spend the time, effort, expense and resources that Volt Power expended in developing this custom-tailored approach to Volt Power's client base.  Under these circumstances, the economic value of Volt Power's trade secrets and other confidential and proprietary information would be severely and irreparably damaged, if not completely lost, as would Volt Power's hard-fought advantage over its competitors.

**Deville's Employment with Volt Power**

22.     On or about March 5, 2018, Volt hired Deville as its Manager, Joint Use Division ("Division Manager").  As Division Manager, Deville was responsible for the overall operations and financial performance of the Joint Use Division.  The Joint Use Division is the center of Volt Power's operations focused on assisting its power delivery clients with the various issues arising from service provider pole attachments discussed above.  Among Deville's other responsibilities as Division Manager was oversight over the preparation and presentation of bid proposals, managing ongoing client projects, and client maintenance and communications.  Deville was also responsible for growing the Joint Use Division's business by contacting current and prospective clients and pitching new proposed projects.  In addition, as Division Manager, Deville oversaw around twenty Joint Use Division employees, and had ultimate responsibility for the employees' job assignments and compensation.

23.     As part of Deville's initial employment with Volt Power, he was provided a copy of the Company's Code of Business Conduct.  Deville agreed to comply with its provisions.  *See* Ex. 1, Excerpt from Code of Business Conduct and Deville Acknowledgements, page 13.  The

4815-8157-9227v1
2934037-000006 02/11/2021

Code of Business Conduct provides as follows regarding the Company's confidential and proprietary information:

### CONFIDENTIAL INFORMATION

All employees may learn, to a greater or lesser degree, facts about our business, plans, operations or "secrets of success" that are not known to the general public or to competitors. Sensitive information such as financial information, customer data, marketing, and strategic plans are examples of our confidential information and/or proprietary trade secret information. The Company's confidential information includes, without limitation, all non-public information that might be of use to competitors, or harmful to us or the customers we serve, if disclosed. In addition, during the course of performing your responsibilities, you may obtain confidential information concerning possible transactions with other companies or receive information concerning other companies which we may be required to maintain as confidential.

**You must maintain the confidentiality of information entrusted to you by us or our customers, unless disclosure is necessary to prevent an injury or accident, authorized by the Company or the owner of the information, or legally mandated by a court or governmental agency.** Employees who possess or have access to confidential information or trade secrets must:

- Not use the information for their own benefit or the benefit of persons inside or outside of the Company.

- Carefully guard against disclosure of that information to people outside the Company. For example, you should not discuss such matters with family members or business or social acquaintances or in places where the information may be overheard.

- Not disclose confidential information to another Company employee unless the employee needs the information to carry out business responsibilities.

**Your obligation to treat information as confidential does not end when you leave the Company.** Upon the termination of your employment, *you must return everything that belongs to us, including all documents and other materials containing our and customers' confidential information*. **You must not disclose or use confidential information to or for a new employer or to or for others after your employment with us ends.** This obligation remains regardless of the reason for termination of your employment. Likewise, you may not disclose your previous employer's confidential information to us, but you should use the general skills and knowledge that you acquired during your previous employment.

Ex. 1., p. 13 (bolded emphasis supplied, italics in original).

24. In his role as Division Manager, Deville had access, among other things, to Volt's confidential and proprietary information, including all of Volt Power's client-specific bid proposals, and Volt Power's financial information relating to its clients and business in Louisiana and elsewhere.  He could also access the identities and roles of Volt Power's crew members and their particular expertise.  Because he was ultimately responsible for overseeing the Joint Use Division employees, he also had access to their compensation and other benefits, along with other personal employee information.

25. Further, and more specifically, Deville had direct access to information relating to Volt Power's clients, suppliers, and business methods and practices.  Deville also had access to Volt Power's pricing, including crew rates, client lists, client information, billing information, client specific budgets, client specific project needs, marketing plans, work orders, *etc*.  All of this information was considered and treated by Volt Power as its confidential and proprietary information.

26. Shortly after Volt Power hired Deville, he was named as a defendant in a lawsuit filed by his prior employer.  *See Foster Cable Servs. v. Deville*, No. 18-01049, United States District Court for the Western Division of Arkansas.  In general terms, that lawsuit alleged that Deville had improperly used and disclosed the confidential information of his prior employer in order to obtain the business of a power delivery client.  *Id.* Volt Power, then known as T&D Solutions, LLC, was named a co-defendant in that lawsuit with Deville.  *Id.*

27. In response to the lawsuit, and because Volt Power believed Deville to be a loyal management-level employee, the Company offered Deville the opportunity to be represented jointly with Volt Power by the undersigned law firm.  In return, Volt Power requested that Deville agree not to solicit its clients or to engage in a competing business either during his

4815-8157-9227v1
2934037-000006 02/11/2021

employment with Volt Power or for a one-year period following the termination of that employment.  Volt Power memorialized this agreement via a Joint Representation Agreement (the "Agreement"), which became effective on or about July 23, 2018.  *See* Exhibit 2, Joint Representation Agreement**.**  The restrictive covenants in the Agreement applied to the Louisiana parishes listed in Exhibit "A" to the Agreement.  *Id.*

28.     The restrictive covenants in the Agreement more specifically provided as follows:

[D]uring your employment with Volt, and in the event your employment with Volt terminates for any reason, for a one-year period following your termination/resignation, you will not, directly or indirectly, on behalf of yourself or any other person or business, call on, solicit, take away or cause the loss of any client of Volt in any of the Louisiana parishes listed on attached **Exhibit A**, and with whom you became acquainted or assisted during your employment. You also agree that, for the same time period as above, you will not, directly or indirectly, on behalf of yourself or on behalf of another person or business, open, operate, carry on, engage in, be employed by, invest in, or provide consulting services to any other business or operation similar to that conducted by Volt, including, but not limited to, providing utility inspection, transmission, distribution, and substation services in any of the Louisiana parishes listed on **Exhibit A**.

Ex. 2, Agreement, p. 2.

29.     Deville further agreed that, in the event he breached the restrictive covenants of the Agreement, Volt Power would be entitled to injunctive relief against him: "It is expressly agreed and understood that the remedy at law for breach of your above agreement not to solicit Volt's clients or to compete with Volt is inadequate and that injunctive relief shall be available to prevent your breach of that agreement." *Id.*

### Deville's Resignation from Volt Power

30.     On December 23, 2020, Deville unexpectedly notified Volt Power that he would be resigning his employment two weeks later, or on January 6, 2021.

4815-8157-9227v1
2934037-000006 02/11/2021

31.     Rather than working through his full two-week notice period, on January 4, 2021, Deville sent Volt Power an e-mail explaining that "[d]ue to unforeseen circumstances" he would be resigning effective immediately.

32.     Other than the timing of his resignation, Deville provided Volt Power with no additional information regarding his resignation, such as the reason for the resignation or whether, or for whom, he intended to work in the future.  Deville then left Volt Power's Boyce, Louisiana office and did not return.

33.     On information and belief, immediately after Deville resigned from Volt Power, Deville became employed by Shelton Energy, which is a power delivery service provider based in Alexandria, Louisiana. Shelton Energy is a direct competitor of Volt Power.

34.     On information and belief, Deville was in contact with Shelton Energy prior to his resignation from Volt Power in order to make arrangements for his new employment with that company.   On further information and belief, in continuing violation of the non-competition covenant in his Agreement, Deville remains an employee of Shelton Energy as of the date of the filing of this Verified Complaint.

**<u>Volt Power's Discoveries Regarding Deville's Conduct Prior to Resignation</u>**

***Solicitation of Volt Power Employees***

35.     When Deville first issued his notice of immediate resignation on January 4, 2021, his colleagues at Volt Power were disappointed.  Little did they know all of the troubling details Volt Power would soon uncover regarding Deville's conduct while still employed with Volt Power.

36.     Volt Power's first discovery occurred less than two weeks after Deville issued his immediate resignation.  Volt Power discovered that, some time before Christmas 2020, within

12

days of Deville making his initial resignation announcement, Deville attempted to solicit Mark Royer to resign from Volt Power and to become employed by Shelton Energy.  Deville targeted Mr. Royer because Mr. Royer was the General Foreman reporting to Deville in the Joint Use Division.  Deville even informed Mr. Royer that his anticipated duties at Shelton Energy would involve providing services to a current Volt Power client.   Mr. Royer declined Deville's attempted solicitation and has since retired from Volt Power.

37.     Since discovering Deville's attempted solicitation of Mr. Royer, Volt Power has connected the resignation of several additional Joint Use Employees that now work for Shelton Energy to the solicitation activities of Deville.  The solicitations of those employees all occurred while Mr. Deville was still employed by Volt Power, around the same time that Deville attempted to solicit Mr. Royer.

38.     Volt Power is now experiencing the direct impact of Deville's solicitation activities by being required to incur the costs associated with attracting and training suitable replacements for those employees solicited by Deville.  Volt Power is also concerned about potential additional impacts to its business that could result from Deville's solicitation of Company employees.  Those concerns include that those former employees could decide, or be persuaded by Shelton Energy, to use Volt Power's confidential and proprietary business information, and their relationships with Volt Power clients, to wrongfully solicit Volt Power's clients.  In short, Deville's improper solicitation of his work colleagues has resulted in great and ongoing harm to Volt Power's business.

*Conversion of Volt Power Electronic Files*

39.     Around the time that Volt Power discovered Deville's improper solicitation of his coworkers, Volt Power began receiving the results from a forensic investigation it was conducting of Deville's work computer.

40.     Volt has discovered that on December 18, 2020, Deville accessed his work computer using his confidential password.  Deville then connected a Verbatim STORE N GO USB drive (s/n: 17112212002265) to his work computer for the first time.  Mr. Deville then created folders "F:\Eric's Personal" and "F:\Tony's Information" on the Verbatim USB drive. Next, Mr. Deville created/copied onto the Verbatim USB the following documents inside folder "F:\Eric's Personal": an excel spreadsheet named "000093-Oct2019-Pricesheet.xlsx" and a document named "T&D Legal Agreement.pdf."[2]

41.     Mr. Deville then removed the Verbatim USB drive attached to his computer laptop and took it with him.  He did not return it to Volt Power or leave it in Volt Power's offices before his January 4, 2021 immediate resignation.  On information and belief, Deville is still in possession of that Verbatim USB drive.

42.     The above "Pricesheet" file Deville copied onto the Verbatim USB drive contains project pricing information for numerous Volt Power clients.  Furthermore, the "F:\Eric's Personal" folder on the Verbatim USB drive also contained documents named "Oncor Joint Use bid_financials_sfs.xlsx" and "References for Oncor.xlsx." Those files relate to a Volt client project bid referred to internally as the "Oncor Joint Use Bid."

43.     The Oncor Joint Use Bid refers to a bid proposal Volt Power prepared in an effort to perform "turnkey" work for a client to assist third parties to obtain or alter access attachments

---

[2]     It is possible that Deville copied other files onto the Verbatim USB drive.  If he "dragged" additional files directly from his work computer onto the drive in order to copy those files onto the drive, the computer would not have recorded that activity.

to the client's power poles.  That bid proposal, and the related computer files Deville converted for his own purposes, would have contained such proprietary and confidential Volt Power business information as internal cost calculations, bid pricing information, project and presentation strategies, as well as list of employee names and specializations.

44.     Deville did not have authorization to access or copy the referenced work computer files for any purpose unrelated to the furtherance of Volt Power's business.

45.     Volt Power also believes that the reference to "Tony" in the folder created by Mr. Deville is either to Tony Jenkins, the former management level employee of Volt Power, who now works at Shelton Energy with Mr. Deville, or Tony Waggoner, another former Volt Power colleague of Deville who is also now a Shelton Energy employee.  It would appear, then, that Deville's activities on his work computer on December 18, 2020 were not limited to the conversion of information that Deville apparently considered useful for his future pursuits, but also involved absconding with Volt Power confidential information that Deville believed would be important to another former Volt Power employee who now works for Shelton Energy.

46.     Notably, at the time that Mr. Deville connected the Verbatim USB drive to his work computer on December 18, 2020, that computer contained a folder titled "Eric's Personal." That folder was deleted from Mr. Deville's work computer as part of his activity described above, leaving only the "Eric's Personal" folder that Mr. Deville created on the Verbatim USB drive.  Deville must have decided that, once he removed the necessary confidential documents from his work computer, there was no longer a need for a folder bearing his name on that computer.

47.     The forensic computer investigation further revealed that, on December 31, 2020, Mr. Deville again accessed his work computer with his confidential password.  He then inserted

another unknown drive named SanDisk Cruzer Glide USB drive (s/n: 20051740101B0DE31DB2) for the first time into his work computer and shortly thereafter he opened an excel spreadsheet named "Cleco New Attachment and Pole counts Nov 2020.xlsx" and a zip file named "TomBigBee Attachment Audit.zip."

48.     Presumably, Mr. Deville accessed those two files to review them after having previously copied them to the SanDisk USB drive.  Those files, like those copied by Deville two weeks earlier, were replete with confidential and proprietary Volt Power business information.  Specifically, these files contained information on ongoing Joint Use Division pole and attachment count projects for the clients named in those files.  As with the previously inserted Verbatim USB drive, Deville took the SanDisk USB drive with him, and did not leave it behind at Volt Power's offices when he resigned on January 4, 2021.  Deville did not have permission from Volt Power to copy the attachment and pole count files, or to access them for any purpose unrelated to Volt Power's business.

49.     As a result of the foregoing, Deville has wrongful possession of highly proprietary information belonging to Volt Power.  Absent intervention by the Court, Volt Power has no viable protection from the irreparable damage Volt Power has and will encounter as a consequence of Deville's improper conversion and use of these confidential computer files for the benefit of his current employer and Volt Power's direct competitor, Shelton Energy.

### *Deville's Attachment Count Bonus Scheme*

50.     More recently, Volt Power has uncovered a scheme by Deville to defraud the Company at the expense of its business relationship with a current Volt Power client.  This scheme, which began in November of 2019, had the intended specific purpose of falsely increasing Deville's bonus for the revenue performance of the Joint Use Division in 2020.

4815-8157-9227v1
2934037-000006 02/11/2021

51.     As Division Manager, Deville was eligible for a yearly bonus based on the revenue performance of the Joint Use Division.  The bonus was payable 80% in December of the year in which the Joint Use Division's revenue performance goals are met or exceeded and 20% the following February, when Volt Power's books for the prior year are considered closed.

52.     Beginning in 2019, Deville assigned several Joint Use Division Field Technicians to engage in an attachment count project for a client without that client's knowledge or approval. Normally, the initiation of an attachment count project would have involved making a bid proposal to the client, and conducting a "kick-off" meeting with the client and, potentially, the third-parties whose pole attachments would be counted as part of the project.  In setting up his fraudulent scheme (the "Attachment Count Scheme"), however, Deville did not follow ordinary Company procedure.  Volt has no record of Deville submitting a bid proposal to, or conducting a kickoff meeting with, the client at issue or any impacted third parties.

53.     In furtherance of the Attachment Count Scheme, Deville instructed the Field Technicians working on the project to record the number of poles they reviewed and the hours they worked and to submit those records for him to approve.  Notably, the time sheets submitted by the Field Technicians in furtherance of the Attachment Count Scheme lacked the usual timesheet identifiers such as a client identifier, project number, or work order number. Furthermore, project timesheets would have typically been reviewed by the General Foreman assigned to the Joint Use Division prior to a final review by Deville.  But that was not the process utilized by Deville in furtherance of his Attachment Count Scheme.  Instead, by having the Field Technicians' time sheets submitted directly to him for approval without the usual client or project identifiers, Deville was able to ensure that he alone was aware of the time spent and the pole counts accomplished by the Field Technicians.

4815-8157-9227v1
2934037-000006 02/11/2021

54.     As indicated above, Volt Power books its revenue at the time it is generated during work on client projects.  In this instance, Volt Power booked the revenue created as part of Deville's Attachment Count Scheme upon the submission and approval of the time and pole count sheets by the Field Technicians who were unknowingly engaged in the Attachment Count Scheme.  Thus, as those Field Technicians submitted their time sheets per Deville's specific instructions, and as those time sheets were approved by Deville, the booked revenue for the Joint Use Division grew, despite that the attachment count project at issue had not been authorized by the client for which the work was purportedly being performed.

55.     Further, because Deville's Attachment Count Scheme was under his sole purview in the Joint Use Division, Volt Power had no reason to know that the revenue that was being generated by the affected Joint Use Division Field Technicians would not be billable to the client.

56.     Deville continued his Attachment Count Scheme from November 2019 through and including January 4, 2021, when he issued his notice of immediate resignation.  As a result of his Attachment Count Scheme, Deville was credited for 2020 revenue bonus purposes with approximately $565,000.00 of Joint Use Division revenue that was not true billable revenue for all of the reasons discussed above.  On December 11, 2020, Volt Power paid Deville 80% of his 2020 revenue bonus in the amount of $32,188.41, based in large part on the revenue generated by the Attachment Count Scheme.  Between that time and the filing of this Complaint, Deville resigned his employment with Volt Power, and Volt Power discovered the Attachment Count Scheme and the $565,000.00 in unbillable revenue Deville improperly generated.

57.     As a direct consequence of Deville's fraudulent Attachment Count Scheme, Volt Power now has on its books approximately $565,000.00 in Joint Use Division revenue that was

not generated in a client-approved project and, therefore, is not billable.  At the same time, Volt Power incurred all of the typical costs, including wages paid to employees, associated with the provision of the services that were provided to the affected client under the Attachment Count Scheme.  In addition, Volt Power is now in discussions with the affected client to rectify any damage to the business relationship between them that has resulted from the Attachment Count Scheme.  Furthermore, Deville, under the Attachment Count Scheme, increased his 2020 revenue bonus payment based on the approximately $565,000.00 in unbillable Joint Use Division revenue and, thus, defrauded Volt Power out of the $32,188.41 2020 revenue bonus payment that Volt Power made to Deville prior to his resignation.

### *Deville Remains in Contact with Volt Power Clients Following his Resignation*

58.     Volt Power has now also learned that, approximately two weeks following Deville's January 4, 2021 resignation, Deville reached out to a current Volt Power employee and requested that employee to send him some internal Volt Power client project documentation regarding a current Volt Power client.

59.     In response, Volt Power contacted its current client to inquire about the basis for Deville's contact and request for the client's information.  The client, who was apparently unaware of Deville's resignation from Volt Power, informed Volt Power that it had misplaced the information that it had requested.   Volt Power then informed the client of Deville's resignation of employment.

60.     This most recent request for client information from Deville reveals several facts of import: (1) that Deville accepted the request for information from a client that he knew was a current Volt Power client at the time of contact; (2) Deville did not inform the Volt Power client that he had resigned his employment with Volt Power; and (3) he reached out to a former Volt

4815-8157-9227v1
2934037-000006 02/11/2021

Power colleague in an attempt to acquire yet additional confidential and proprietary information from Volt Power regarding its client relationship and its progress on the client's project.

61.     Volt Power believes that these most recent actions by Deville reveal that he is attempting to work for current Volt Power clients, and to solicit them, all in violation of the restrictive covenants in his Agreement.  It also reveals that Deville is still attempting to obtain and use confidential and proprietary Volt Power documentation for the benefit of himself and his new employer, in violation of the confidentiality provisions of the Volt Power Code of Business Conduct and applicable law.

62.     Overall, all of this conduct on the part of Deville has resulted in substantial and ongoing damage to Volt Power, the extent and depth of which is still coming to light.  Deville's conduct in soliciting Volt Power employees prior to his resignation, his conversion of Volt Power documents for his own purposes, his creation of the Attachment Count Scheme, and his continued contact and presumable solicitation of Volt Power clients have resulted in substantial damage to the business of Volt Power.   Absent this Court's intervention, the past and ongoing harm Deville has caused to Volt Power, including that which is irreparable, will have no remedy, and Volt Power will have no justice.

## FIRST CAUSE OF ACTION

## <u>VIOLATION OF THE DEFEND TRADE SECRETS ACT</u>

63.     Volt Power re-alleges and incorporates by reference the allegations contained in Paragraphs 1-62 of this Verified Complaint.

64.     Volt Power's client contact identities, its pricing information, including crew rates, its bid proposals, project progress reports and information, sales strategies, work orders, client lists, project plans and processes, and all of the other confidential business information

4815-8157-9227v1
2934037-000006 02/11/2021

described in this Complaint, including those materials contained in the computer files converted by Deville in December 2020, constitute trade secrets within the meaning of 18 U.S.C. § 1839(3).  Volt Power has gone to great lengths to protect those trade secrets, including requiring its employees to agree to abide by the non-disclosure provisions of the Volt Power Code of Business Conduct by protecting that information in electronic format through password protection, and by restricting access to that information to only those employees who have reason to access the information for business reasons.  The trade secrets have actual and potential economic value by not being generally known, as having that information remain secret allows Volt Power to competitively price its services and to have direct contact with its clients - things that third parties who lack such information cannot accomplish.  In addition, because Volt Power conducts business throughout the country, including over the phone, on the internet, and via mail service, these trade secrets were and are frequently used by Volt Power in interstate commerce.

65.     Deville misappropriated Volt Power's trade secrets within the meaning of 18 U.S.C. § 1839(5).  Deville had reason to know that his knowledge of Volt Power's trade secrets was acquired by him under circumstances that gave rise to a duty to maintain the secrecy and to limit the use of the trade secrets.  He then surreptitiously converted Volt Power's trade secrets, including the computer files discussed above, for the purpose of using and disclosing those trade secrets for his own benefit and for the benefit of his new employer, Shelton Energy.  Volt Power did not consent to any of Deville's actions in this regard.

66.     The conduct of Deville alleged herein violated the DTSA and resulted in damages to Volt Power.

4815-8157-9227v1
2934037-000006 02/11/2021

67.     Volt Power, as the owner of the trade secrets misappropriated by Deville, is entitled to bring a private civil action against Deville for injunctive relief, for damages and/or unjust enrichment resulting from the use by Deville of the trade secrets.  *See* 18 U.S.C. § 1836.

68.     Furthermore, Deville continued his wrongful conduct despite having agreed to abide by the non-disclosure provisions of the Volt Employee Code of Business Conduct and after his counsel was notified that Volt Power believed that Deville had engaged in wrongful conduct on his work computer.  Thus, the conduct of Deville alleged herein was willful and malicious, entitling Volt Power to an award of exemplary damages and attorney's fees.  *See* 18 U.S.C. § 1836(b)(3)(C).

**SECOND CAUSE OF ACTION**

**SPECIFIC PERFORMANCE**

69.     Volt Power adopts and incorporates by reference the allegations set forth in paragraphs 1-68 of this Verified Complaint.

70.     As indicated above, Deville agreed: (a) to be bound by the non-disclosure terms of Volt Power's Code of Business Conduct, including a prohibition on use or disclosure any of Volt Power's proprietary business information or trade secrets; (b) not to solicit Volt Power's clients; and (c) not to compete with Volt Power.

71.     Deville has failed to comply with the obligations to which he agreed.  Instead, he has specifically breached those obligations by converting Volt Power's trade secrets and proprietary business information, soliciting Volt Power's clients, and by having worked for, and currently working for, Shelton Energy, which is an enterprise that is directly competitive with Volt Power.

4815-8157-9227v1
2934037-000006 02/11/2021

72.     As a result of the failure of Deville to honor his agreed obligations to Volt Power, Volt Power is entitled, by order of this Court, to specific performance by Deville of each of those obligations.

### THIRD CAUSE OF ACTION

### <u>BREACH OF CONTRACT</u>

73.     Volt Power adopts and incorporates by reference the allegations set forth in paragraphs 1-72 of this Verified Complaint.

74.     Deville agreed: (a) to be bound by the non-disclosure terms of Volt Power's Code of Business Conduct, including a prohibition on use or disclosure of any of Volt Power's proprietary business information or trade secrets; (b) not to solicit Volt Power's clients; and (c) not to compete with Volt Power.

75.     Deville has not abided by his contractual obligations to Volt.  Instead, he has specifically breached those obligations by converting Volt Power's trade secrets and proprietary business information, soliciting Volt Power's clients, and by having worked for, and currently working for, Shelton Energy, which is an enterprise that is directly competitive with Volt Power.

76.     The foregoing actions of Deville constitute breach by Deville of his agreement to comply with the confidentiality terms of Volt Power's Code of Business Conduct and breach of the restrictive covenants of his Agreement.  These breaches of contract have damaged and will continue to damage Volt Power.  Deville is liable to Volt Power for all such damages.

77.     As a direct and proximate result of these breaches of contract by Deville, Volt Power has suffered and will continue to suffer irreparable injury for which Volt Power possesses no adequate remedy at law.

4815-8157-9227v1
2934037-000006 02/11/2021

**FOURTH CAUSE OF ACTION**

**VIOLATION OF LOUISIANA UNIFORM TRADE SECRETS ACT**

78.     Volt Power adopts and incorporates by reference the allegations set forth in paragraphs 1-77 of this Verified Complaint.

79.     As indicated in Volt Power's Code of Business Conduct and the Agreement, the confidential and proprietary business information acquired by Deville that was used improperly for his own benefit, and that was improperly disclosed by him for his own benefit and for the benefit of Shelton Energy, all constitute trade secrets under the Louisiana Uniform Trade Secrets Act, La. R.S. § 51:1431, *et seq.* (the "LUTSA").

80.     Deville, by virtue of his status as the Manager of Volt Power's Joint Use Division, and by acknowledging and agreeing to comply with the confidentiality provisions of Volt Power's Code of Business Conduct, knew or had reason to know that he owed a duty to Volt Power to maintain the secrecy of, and not misappropriate, such proprietary and confidential information of Volt Power.

81.     The conduct of Deville described herein, including his wrongful disclosure and use of Volt Power's trade secrets, constitutes actionable misappropriation under the LUTSA.

82.     In addition, given Deville's ongoing refusal to return Volt Power's trade secrets, despite his obligation to do so, and his continued and willful use and disclosure of those trade secrets for his own benefit, it is clear that Deville has acted willfully and maliciously in misappropriating and using Volt Power's trade secrets.

83.     Volt Power has incurred damages as a direct and proximate result of Deville's misappropriation and use of its trade secrets and is therefore entitled to a judgment from this court, in Volt Power's favor, and against Deville, in the full amount of such damages, to be

24

proven at trial, plus prejudgment interest on those amounts.  *See* La. R.S.  § 51:1433.  In addition, because Deville has acted willfully and maliciously in misappropriating, using, and disclosing Volt Power's trade secrets, Volt Power is entitled to its reasonable attorney's fees pursuant to La. R.S. § 51:1434.

84.     Furthermore, as a direct and proximate result of Deville's conversion and theft of Volt Power's trade secrets, Volt Power has suffered and will continue to suffer irreparable injury for which Volt Power possesses no adequate remedy at law.

## FIFTH CAUSE OF ACTION

## VIOLATION OF LOUISIANA UNFAIR TRADE PRACTICES ACT

85.     Volt Power adopts and incorporates by reference the allegations set forth in paragraphs 1-84 of this Verified Complaint.

86.     Deville is a competitor of Volt Power and is employed by Shelton Energy, a competing company that is a direct competitor of Volt Power.

87.     Deville's conduct described herein offends established public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious, as Deville engaged in the conduct with the express and specific intent of damaging Volt Power's reputation, business, and competitive abilities.

88.     By engaging in the conduct described herein, Deville used his position as an employee of Volt Power, and the proprietary Volt Power business information he obtained in that role, to unfairly recruit and solicit Volt Power's employees and clients, and to directly compete with Volt Power with the advantage of those recruitment and solicitation efforts, resulting in immediate damage to Volt Power's business operations. This conduct violated the Louisiana Unfair Trade Practices Act, La. R.S. 51:1401, *et seq.* (the "LUTPA").

89.     As a direct and proximate result of Deville's conduct described herein, Deville caused Volt Power to incur an unascertainable amount of damages, including, but not limited to, the expenses associated with the financial and reputational damage to Volt Power as a result of the loss of its employees and Deville's unsanctioned competition with Volt Power, losses associated with the transfer of Volt Power's confidential information, including crew rates, to Shelton Energy, the costs arising from attempting to remediate the damages caused by Deville's conduct described herein, and the attorney's fees and costs Volt Power has incurred in initiating and pursuing this lawsuit.

90.     Deville is liable to Volt Power for the losses it has incurred as a result of his violations of the LUTPA.

## SIXTH CAUSE OF ACTION

## <u>UNJUST ENRICHMENT</u>

91.     Volt Power adopts and incorporates by reference the allegations set forth in paragraphs 1-90 of this Verified Complaint.

92.     As alleged above, as part of his Attachment Count Scheme, Deville instructed various Joint Use Division Field Technicians to provide attachment count services to at least one Volt Power client, and to bill their time to that client, all without the client's authorization to do so. The Field Technicians were, likewise, unaware that the services Deville instructed them to provide to the client were unauthorized. Because Volt Power books its revenue at the time it provides services to its clients, Deville unjustly benefitted from the unauthorized work of the Field Technicians because Deville's 2020 revenue bonus compensation was based, in material part, on the revenue that was generated as part of the unauthorized work in which Deville instructed the Field Technicians to engage.

26

93.     This conduct on the part of Deville in furtherance of his Attachment Count Scheme resulted in him receiving a higher 2020 revenue bonus than he would have absent requiring the Field Technicians to unknowingly engage in unauthorized work.

94.     Deville had no right to increase his compensation through his improper Attachment Count Scheme.

95.     Volt Power, meanwhile, has paid the full wages due Joint Use Division Field Technicians members who unknowingly performed the unauthorized work required by Deville, but cannot collect on the amounts billed by the crew members in connection with that work. This has resulted in Volt Power becoming impoverished on the order of more than $565,000.00.

96.     Pursuant to La. C.C. art. 2298, Deville is liable to Volt Power for his unjust enrichment either: (a) to the extent he was enriched; or (b) to the extent Volt Power was impoverished by his conduct, whichever is less.

**SEVENTH CAUSE OF ACTION**

**<u>BREACH OF FIDUCIARY DUTIES</u>**

97.     Volt Power adopts and incorporates by reference the allegations set forth in paragraphs 1-96 of this Verified Complaint.

98.     Deville was an employee of Volt Power and served as Division Manager for its Joint Use Division.  As a Volt Power employee engaged in that important role, Deville had fiduciary duties of fidelity and loyalty to Volt Power.

99.     Unbeknownst to Volt Power, while Deville served in these roles for Volt Power, he was improperly using his position, his relationship with Volt Power employees, his inside knowledge of Volt Power's relationships with its clients, and the confidential and proprietary Volt Power business information to which he had access by virtue of that position, to forward his

27

own financial and business interests and the same interests of Shelton Energy to the detriment of Volt Power.  Among other ways, he did this by soliciting his colleagues during his employment with Volt Power to become employees of Shelton Energy, by converting confidential and proprietary Volt Power business information for his own purposes, and by violating his agreement by competing with Volt Power and by soliciting Volt Power clients.

100.    All of this conduct by Deville constituted repeated breaches of his fiduciary duties of loyalty and fidelity to Volt Power.

101.    As a proximate and direct cause of the breaches by Deville of his fiduciary duties, Volt Power has incurred substantial damages, including damages resulting from having to repair relationships with its employees and clients, the losses associated with having its confidential and proprietary business information, including crew rates, transferred to Shelton Energy, financial and reputational damages resulting from all of Deville's behavior as alleged herein, and other such damages that will be proven at trial.

102.    In addition, as a proximate and direct cause of the breaches by Deville of his fiduciary duties, Volt Power has suffered, and continues to suffer from irreparable injuries for which Volt Power possesses no adequate remedy at  law.

## EIGHTH CAUSE OF ACTION

## <u>FRAUD</u>

103.    Volt Power adopts and incorporates by reference the allegations set forth in paragraphs 1-102 of this Verified Complaint.

104.    Beginning in November 2019, Deville intentionally decided to usurp the Joint Use Division's Field Technicians for the purpose of his Attachment Count Scheme without regard to the potential impact of such actions upon Volt Power.

4815-8157-9227v1
2934037-000006 02/11/2021

105.    As part of his Attachment Count Scheme, Deville convinced the affected Joint Use Division Field Technicians that they were working on a properly-authorized attachment count project for a known Volt Power client.  Deville required those Field Technicians to work in furtherance of his Attachment Count Scheme, all without the knowledge of the Field Technicians that their efforts would, ultimately, not be billable but, instead, would unilaterally be used by Deville for the purpose of increasing his 2020 revenue bonus compensation by artificially increasing the revenue of the Joint Use Division in 2020.

106.    In furtherance of Deville's intentional and deceitful Attachment Count Scheme, and as alleged above, Deville required the impacted Field Technicians to record their time on timesheets that lacked the usual client identification, job number, or work order numbers, which timesheets Deville then approved himself without the knowledge of Volt Power.  The purpose of this unorthodox time recording and approval process, of course, was to hide the ongoing Attachment Count Scheme from Volt Power.   Meanwhile, through intentional silence or affirmative misrepresentation, Deville did not disclose the existence of the Attachment Count Scheme, its intended effects, or its likely consequences to Volt Power.

107.    Volt Power had no reason to know that Deville was engaging in his wrongful Attachment Count Scheme until after his resignation.  Deville was a trusted Division Manager. Volt Power similarly had no reason to believe that Deville would engage in a fraudulent scheme designed to deprive and defraud Volt Power from the benefit of the services of its Joint Use Division Field Technicians for the sole purpose of wrongfully inflating Deville's 2020 revenue bonus calculation. Thus, Volt Power was justified on relying on Deville to conduct himself properly as the Division Manager rather than having any reason to suspect that he was engaged in his fraudulent Attachment Count Scheme.

4815-8157-9227v1
2934037-000006 02/11/2021

108.     Deville specifically intended the consequences of his Attachment Count Scheme – that he would falsely elevate his 2020 revenue bonus prior to resigning from Volt Power to then go work for Volt Power's competitor, Shelton Energy.  Deville's material misrepresentations or omissions, as alleged herein, were one of the main reasons, if not the main reason itself, that Deville's scheme to defraud Volt Power in order to wrongfully increase his 2020 revenue bonus was unfortunately successful.

109.     Deville's fraudulent Attachment Count Scheme as alleged herein, resulted in substantial damage to Volt Power's business, including approximately $565,000.00 in lost revenue for the Company that has been recorded but, because it resulted from work that was not properly authorized by the affected client, cannot be billed to the client.  The Attachment Count Scheme has also caused untold damage to Volt Power resulting from its impact upon Volt Power's relationship with the affected client.   Furthermore, Deville's fraudulent Attachment Count Scheme resulted in Volt Power paying Deville a falsely-elevated 2020 revenue bonus in the amount of $32,118.41 to which Deville was not entitled.  Deville is liable to Volt Power for all of these damages.  Deville's conduct in this regard has also resulted in, and continues to result in irreparable injuries to Volt Power for which Volt Power has no adequate remedy at law.

**WHEREFORE**, Volt Power respectfully requests the Court to enter judgment in its favor on Volt Power's eight causes of action and award the following relief:

(a)     Preliminary and permanent injunctive relief, as set forth in Volt Power's Ninth Cause of Action below;

(b)     Compensatory/actual damages in an amount to be determined at trial; and

(c)     Reasonable attorney's fees and such other relief as the Court deems just and proper.

30

## NINTH CAUSE OF ACTION

## <u>INJUNCTIVE RELIEF</u>

110.    Volt Power adopts and incorporates by reference the allegations set forth in paragraphs 1-109 of this Verified Complaint.

111.    Volt Power has a clearly ascertainable and protectable right to: (i) enforce its Agreement with Deville; (ii) prevent the unauthorized disclosure and/or use of its confidential and proprietary business information; (iii) maintain a stable workforce and protect against the raiding of key employees by former employees and competitors; and (iv) prevent the poaching by Deville or his employer of Volt Power's clients to the benefit of Deville or his employer.

112.    Volt Power has a strong likelihood of prevailing on the merits of its causes of action, including those causes of action which entitle Volt Power to injunctive relief.

113.    Volt Power's remedy at law is inadequate, and it will suffer irreparable harm if injunctive relief is not granted, because, among other things, it derives immeasurable value from: (i) the secrecy of its trade secrets and other confidential and proprietary information, including information relating to the maintenance and servicing of its clients and the terms thereof; (ii) the stability of its workforce and key employees that are essential to the operation of Volt Power and for the maintenance of client relationships; and (iii) the stability of Volt Power's client base and continued good relationships and goodwill with those clients; and (iv) the terms of the Agreement to which Deville voluntarily agreed, and for which he received valuable consideration in the form of legal representation by Volt Power's attorneys.  All of these protectable interests afford Volt Power a competitive advantage in the marketplace.  If the status quo is not maintained, Volt Power will continue to lose this competitive advantage.

4815-8157-9227v1
2934037-000006 02/11/2021

114.    Deville will not be injured by the entry of an injunction because Deville cannot properly claim injury from being enjoined from conduct of which he is legally prohibited from pursuing or to which he voluntarily obligated himself not to pursue.

115.    The public interest is in favor of protecting property rights and fair competition in the marketplace.  Certainly the public interest is not offended by restraining Deville from using Volt Power's trade secrets and other confidential and proprietary information, and by unlawfully competing with Volt Power and soliciting Volt Power's employees and clients in violation of the Agreement, all to the detriment of Volt Power.

116.    Furthermore, as alleged herein, Deville is in clear breach of the restrictive covenants contained in his Agreement.  In the Agreement, Deville specifically agreed that, in the event he breached those restrictive covenants, Volt Power would be entitled to obtain injunctive relief against him.  Volt Power requests the Court to enforce the Agreement through the entry of the requested injunctive relief.

**WHEREFORE**, Volt Power respectfully requests the Court to enter judgment in its favor on Volt Power's Ninth Cause of Action and award the following relief:

(a)    Preliminary and permanent injunction, to restrain and enjoin Deville from, directly or indirectly, misappropriating, disclosing and/or using Volt Power's trade secrets and confidential business information for any purpose, including to solicit Volt Power's employees and clients to become the employees and clients of Deville and/or Shelton Energy;

(b)    Preliminary and permanent injunction to enjoin Deville from developing, marketing and/or selling any services incorporating Volt Power's trade secrets, confidential information and/or exclusive intellectual property rights;

(c)      Preliminary and permanent injunction requiring Deville to immediately return to Volt Power, and not to retain and to destroy any copies in any form of, all of Volt Power's confidential and proprietary information in his actual or constructive possession;

(d)      Preliminary and permanent injunction to enjoin Deville from continued violation of the Agreement, and specifically, his covenant not to compete with Volt Power by, among other methods, prohibiting Deville from working for Shelton Energy for the remaining period of the non-competition covenant contained in the Agreement;

(e)      Preliminary and permanent injunction requiring Deville to submit the USB drive devices described herein, and all such other phones and computers and such other electronic storage and email-capable devices to which he has had access since December 18, 2020, to a forensic computer/device inspection in order to determine the scope of Deville's conversion, possession, and disclosure of Volt Power's computer files and/or other confidential and proprietary Volt Power information; and

(f)      Such other relief as the Court deems just and proper.

## JURY DEMAND

Volt Power demands trial by jury on all the claims for damages.

3436199
4815-8157-9227v1
2934037-000006 02/11/2021

Respectfully submitted,

**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**

By:____/s/ Christopher G. Morris
PHYLLIS G. CANCIENNE (19605)
CHRISTOPHER G. MORRIS (28847)
Chase North Tower
450 Laurel Street, 21st Floor
Baton Rouge, Louisiana 70801
Email: pcancienne@bakerdonelson.com
Email: cmorris@bakerdonelson.com
Telephone:  (225) 381-7000
Facsimile:  (225) 343-3612

**ATTORNEYS FOR VOLT POWER, LLC**

Please Issue Summons To:

James Eric Deville
3864 L'Anse Bleu
Ville, Platte, Louisiana 70586